UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE

AMERICAN EXPRESS MERCHANTS'                    Master File No. 03 CV 9592 (GBD)
LITIGATION.
                                               <u>MEMORANDUM OPINION</u>
                                                      <u>& ORDER</u>

------------------------------------------------------------x
GEORGE B. DANIELS, DISTRICT JUDGE:

    American Express Company and American Express Travel Related Services Company,

Inc., (collectively "American Express") move to compel arbitration of plaintiffs' claims and to

dismiss these related actions consolidated for pretrial purposes or stay them pending arbitration.[1]

American Express also moves to intervene and to dismiss in favor of arbitration the claims of

plaintiffs in the separate case filed by plaintiffs against the banks entitled <u>National Supermarket</u>

<u>Association, Inc., et al. V. MBNA America Bank, N.A., et al.</u> ("<u>National Supermarket</u>").[2]  The

bank defendants in <u>National Supermarket</u> move to dismiss the claims of plaintiffs in favor of

arbitration or, in the alternative, to stay the action pending the arbitration of the related claims

against American Express.  Finally, the plaintiffs in <u>Cohen Rese Gallery, Inc., et al. v. American</u>

<u>Express Co., et al.</u> ("<u>Cohen Rese</u>"), who are California merchants, move for partial summary

judgment on the fifth claim for relief set forth in their amended complaint.[3]

---

[1]The consolidated cases are: <u>Italian Colors Restaurant, et al. v. American Express Co., et al.</u>, 03 cv 9592; <u>Cohen Rese Gallery, Inc., et al. v. American Express Co., et al.</u>, 03 cv 10271; <u>DFR Jeweler Corp. v. American Express Co., et al.</u>, 03 cv 9517; <u>Chez Noelle Restaurant v. American Express Co., et al.</u>, 04 cv 266; <u>Mascari Enterprises v. American Express Co., et al.</u>, 04 cv 366; and <u>Mims Enterprises, Inc. v. American Express Co., et al.</u>, 04 cv 1558.

[2]<u>National Supermarket Association, Inc., et al. v. MBNA America Bank, N.A., et al.</u>, 04 cv 10318, is also consolidated for pretrial purposes.  Plaintiffs in <u>National Supermarket</u> are also plaintiffs in a number of the other consolidated cases.

[3]Claim five asserts that the defendants are in violation of the California Unfair Competition Law by forcing small merchants to waive the right to participate in both class

American Express's motion to compel arbitration is granted, and plaintiffs' claims against American Express are dismissed. American Express's motion to intervene and to dismiss the claims of plaintiffs against the banks in National Supermarket is denied. Defendants' MBNA America Bank, N.A., MBNA Corporation, Citibank (South Dakota), N.A., and Citigroup, Inc. ("bank defendants") motion to dismiss the claims in National Supermarket is denied. The bank defendants' motion to stay the action in National Supermarket pending the arbitration of related claims against American Express, is granted. Finally the Cohen Rese plaintiffs' motion for partial summary judgment on their fifth claim against American Express is denied without prejudice.

BACKGROUND[4]

Plaintiffs are merchants who accept defendant American Express's payment card products. They can be divided into two different geographic groups: those plaintiffs whose primary place of business is in the state of New York ("New York merchants"), which includes Italian Colors Restaurant[5], ("Italian Colors"), DRF Jewelers Corp., ("DRF"), Chez Noelle Restaurant, ("Chez Noelle"), Mascari Enterprises, ("Mascari"), and Mims Enterprises, Inc., ("Mims"); and those plaintiffs based in California ("California merchants"), Cohen Rese Gallery, Inc., ("Cohen Rese"), Il Forno, Inc., ("Il Forno"), and Mai Jasmine Corp., ("Mai Jasmine"). Each merchant plaintiff contracted with American Express to accept its corporate, charge, and credit

actions and class-wide arbitrations as a condition of doing business with American Express through the collective action waivers in the merchant contracts.

[4] The factual background underlying these actions is set forth in greater detail in the related case of Marcus Corp. v. American Express, No. 04 Civ. 05432 (S.D.N.Y. July 6, 2005) (denying defendants' motion to dismiss).

[5] Plaintiff Italian Colors Restaurant consists of a previously consolidated group of New York merchants, including Phuong Corp., Bunda Starr Corp., 492 Supermarket Corp., and National Supermarkets Association, Inc.

cards.[6]

American Express and its competitors Visa, MasterCard, and Discover collectively dominate the payment card industry.[7] Visa and MasterCard operate as joint ventures with the banks that issue their payment cards to consumers. American Express, by contrast, has until recently issued payment cards directly to the consumer, without partnering with banks. Having accepted a customer's payment card, merchants tender requests for payment to American Express or, in the case of Visa and MasterCard, to the card-issuing bank.[8] Both the Visa/MasterCard and American Express models derive revenue by withholding a "merchant discount fee" from each tendered transaction. Plaintiffs allege that American Express charges a supra-competitive 3% merchant discount fee that greatly exceeds the fee charged by Visa and MasterCard. Plaintiffs contend that this supra-competitive fee can be sustained only through enforcement of an Honor All Cards ("HAC") provision, included in every merchant contract, that unlawfully ties American

---

[6]A charge card requires its holder to pay the full outstanding balance at the end of a standard billing cycle. A credit card, by contrast, allows the cardholder to pay a portion of the amount owing at the close of a billing cycle, subject to interest charges. In plain terms, the credit card is a means of financing purchases, the charge card is a method of payment.

[7] The payment card industry has been extensively discussed in recent litigation. Undisputed industry facts cited in this order are derived from United States v. Visa U.S.A., Inc., 163 F.Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), *cert. denied*, 125 S. Ct. 45 (2004).

[8]In 2003, the Second Circuit affirmed a ruling that Visa and MasterCard violated anti-trust statutes by colluding to require that their credit card-issuing bank partners refuse to issue American Express products; this collusion had effectively barred American Express from the credit card market. Prior to the resolution of the Department of Justice ("DOJ") litigation, Visa and MasterCard collectively controlled upwards of 90% of the credit card market. Since obtaining competitive access to card-issuing banks, however, American Express has moved aggressively into the market while maintaining its position as the leading issuer of corporate and consumer charge cards in the United States. Since the resolution of the DOJ litigation, American Express has negotiated card-issuing agreements with two of the nation's largest card-issuing banks, MBNA and Citibank.

Express's charge and credit card services in violation of § 1 of the Sherman Act.[9]  Put simply,

merchants who choose to accept the charge card must agree to accept *all* American Express

cards.[10]

The merchant contract, or Card Acceptance Agreement ("Agreement"), is a 'form

contract,' such that merchants do not negotiate its terms with American Express.  Since 1999,

American Express has included an arbitration provision in the Agreement.  It requires arbitration

of all claims "arising from or relating to this Agreement and/or the relationship resulting from

this Agreement," upon the election of either party.  2001 American Express Card Acceptance

Agreement, Defs.' Ex. A.  The arbitration provision reads, in relevant part:

> For the purpose of this Agreement, *Claim* means any assertion of a
> right, dispute or controversy between you and us arising from or
> relating to this Agreement and/or the relationship resulting from this
> Agreement . . .
>
> This section sets out the circumstances and procedures under which
> Claims may be arbitrated instead of litigated in court . . .
>
> Any Claim shall be resolved upon the election by you or us, by
> arbitration pursuant to this arbitration provision and the code of
> procedure of the national arbitration organization to which the
> Claim is referred in effect at the time the Claim is filed.  Claims

---

[9]A typical tying arrangement is "an agreement by a party to sell one (tying) product but only on the condition that the buyer also purchases a different (or tied) product." Eastman Kodak Co. v. Image Tech. Svcs., Inc., 504 U.S. 451, 461-62 (1992) (quoting Northern Pac. Ry. v. United States, 356 U.S. 1, 5-6 (1958)).  The Supreme Court identifies the "essential characteristic" of an unlawful tying arrangement as "the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Jefferson Parish v. Hyde, 466 U.S. 2, 12 (1984).

[10] "*American Express Card* or *Card* shall mean any card or other account access device issued by American Express Travel Related Services Company, Inc. or its subsidiaries or affiliates or its or their licensees bearing the American Express name or an American Express trademark, service mark or logo." 1999 American Express Card Acceptance Agreement, Pls.' Ex. 2, Decl. of Noah Shube.

shall be referred to the National Arbitration Forum (*NAF*), JAMS/Endispute (*JAMS*), or the American Arbitration Association (*AAA*), as selected by the party electing to use arbitration. If a selection by one of these organizations is unacceptable to you, you shall have the right within thirty (30) days after you receive notice of our election to select one of the other organizations listed to serve as arbitrator administrator.

In addition to prescribing binding arbitration of all claims, the Card Acceptance Agreement imposes a collective action waiver that precludes merchants from bringing or participating in class-wide actions regarding issues subject to arbitration. The provision reads, in relevant part:

> IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THE CLAIM, OR TO ENGAGE IN PRE-ARBITRATION DISCOVERY EXCEPT AS PROVIDED IN THE CODE OR PROCEDURES OF THE NAF, JAMS, OR AAA, AS APPLICABLE. FURTHER, YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.

The Card Acceptance Agreement also includes a New York choice of law provision that reads:

> THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS NEGOTIATED, EXECUTED AND PERFORMED ENTIRELY WITHIN THE STATE OF NEW YORK.

The complaints filed by the New York and California plaintiffs are largely identical, with

slight variance in the number and type of claims.[11]  All plaintiffs state three claims against American Express under Section 1 of the Sherman Act: 1) unlawful tying of charge card services and credit card services; 2) unlawful tying of corporate card services and credit card services; and 3) unlawful tying of charge or corporate card services and debit card services.  Each New York plaintiff also states an additional claim under Section 2 of the Sherman Act, alleging that American Express maintains a monopoly by imposing a collective action waiver in each of its merchant contracts.  Certain New York plaintiffs[12] also state a common law claim of unjust enrichment, alleging that the imposition of the supra-competitive merchant discount fee conferred an illegal benefit on American Express.  California plaintiffs Cohen Rese, Il Forno, and Mai Jasmine additionally claim that the collective action waivers violate California's Unfair Competition Law.

<u>DISCUSSION</u>

American Express moves pursuant to 9 U.S.C. § 1 et seq. and Fed.R.Civ.P. 12(b) to compel plaintiffs to arbitrate their claims, and asks that this court either dismiss plaintiffs' complaints or stay the proceedings pending arbitration.  Under the Federal Arbitration Act ("FAA")[13], a district court may dismiss or stay proceedings if it finds a valid arbitration

---

[11]Plaintiffs in the related case of <u>National Supermarket</u> have separately alleged that the bank defendants 1) conspired to violate section 1 of the Sherman Act by furthering the alleged tying by American Express of corporate charge card and credit card services, and 2) aided and abetted American Express's alleged violations of section 1 of the Sherman Act by rendering assistance to American Express in its alleged tying of corporate charge card and credit card services.

[12]DRF, Chez Noelle, Mascari, and Mims.

[13]The Arbitration Provision expressly states that the parties' agreement to arbitrate "is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act."  <u>See</u> Cathryn A. Snyder Decl., Ex. B and D; Donald Blumenthal Decl., Ex. A.

agreement exists and may compel arbitration when a party refuses to comply with that agreement. 9 U.S.C.S. §§ 3-4.

"The question of 'substantive arbitrability' is for the court not for the arbitrator to decide." Livingston v. John Wiley & Sons, Inc., 313 F.2d 52, 55 (2d Cir. 1963) (citing Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241 (1962)). In order to determine whether or not a particular dispute is arbitrable, a court must decide "whether the parties agreed to arbitrate, and if so, whether the scope of that agreement encompasses the asserted claims." Progressive Cas. Ins. Co. v. C.A. Reaseg'Uradora Nacional de Venezuela, 991 F.2d 42, 45 (2d Cir. 1993) (quoting David L. Threlkeld & Co. v. Metallgesellschafr Ltd., 923 F.2d 245, 149 (2d Cir. 1991)). While there is a strong federal policy favoring arbitration, a party may only be compelled to arbitrate a dispute to the extent he or she has agreed to do so. Bell v. Cedent Corp., 293 F.3d 563, 566-67 (2d Cir. 2002); John Hancock Life Ins. v. Wilson, 254 F.3d 48, 58 (2d Cir. 2001). Where the scope of the arbitration agreement is ambiguous, any doubt should be resolved in favor of arbitration. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). "Another way of expressing this is to say that arbitration must not be denied unless a court is positive that the clause it is examining does not cover the asserted dispute." Spear, Leeds & Kellogg v. Central Life Assur. Co., et al., 85 F.3d 21, 28 (2d Cir. 1996) (citing AT&T Technologies, Inc. v. Communications Workers of America, et al., 475 U.S. 643, 650 (1986)). Absent some ambiguity, however, it is the language of the contract that defines the scope of disputes subject to arbitration. Equal Employment Opportunity Comm. v. Waffle House, Inc., 534 U.S. 279 (2002).

American Express contends that plaintiffs are obliged to arbitrate their claims pursuant to the arbitration provision in their merchant contracts. In opposition, plaintiffs argue, *inter alia,*

that to arbitrate their anti-trust claims individually would impose such punishing costs as to preclude vindication in that forum. All plaintiffs also argue that Claim IV of their amended complaints, which challenges the imposition of the collective action waiver provisions as an anti-trust violation in its own right, is inherently inarbitrable. The California plaintiffs, in their motion for partial summary judgment, claim that American Express's imposition of the collective action waiver provisions violated the California Unfair Competition Law by forcing small merchants to waive their right to participate in both class actions and class-wide arbitrations as a condition of doing business with American Express. Those plaintiffs who signed merchant contracts prior to 1999 (the "pre-1999 plaintiffs")[14] deny having received defendant's mailing of that year imposing the arbitration and collective action waiver provisions. The pre-1999 plaintiffs further claim that the change-in-terms clause of their original contracts did not authorize the addition of an arbitration provision.

A. Enforceability of the Arbitration Agreement

The FAA established a "liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp., 460 U.S. at 24; see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991). The FAA instructs courts that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2005). Congress enacted the FAA for the purpose of "revers[ing] the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., the United States

---

[14] The pre-1999 plaintiffs are Italian Colors, Bunda Starr, Chez Noelle, Mascari, Il Forno, and 492 Supermarket Corp. See Snyder Decl. at 3-6.

Supreme Court directed that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." 473 U.S. 614, 626 (1985); see also Paine Webber, Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996). Thus, courts are to "construe arbitration clauses as broadly as possible." Oldroyd v. Elmira Savings Bank, FSB, 134 F.3d 72, 76 (2d Cir. 1998) (quoting Collins & Aikman Prod. Co. v. Building Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995) (The parties were required to submit to arbitration "any claim or controversy arising out of or relating to th[e] agreement." The Second Circuit Court of Appeals found this to be "the paradigm of a broad clause," and further held that the claims at issue there were "presumptively arbitrable" pursuant to the clause)).

The arbitration provision in the merchant plaintiffs' card acceptance agreements is also a paradigmatically broad clause, thereby justifying a presumption of arbitrability. See Oldroyd, 134 F.3d at 76 (enforcing a clause requiring arbitration of "[a]ny dispute, controversy or claim arising under or in connection with" appellee's employment agreement); Mehler v. Terminex Int'l Co. L.P., 205 F.3d 44, 49 (2d Cir. 2000) ("There is no dispute that the arbitration clause at issue is a classically broad one. . . . The clause provides for arbitration of 'any controversy or claim between [the parties] arising out of or relating to' the Agreement."). Plaintiffs' claims fall within the broad scope of the arbitration provision of the merchant Card Acceptance Agreement which covers "any claim, dispute or controversy between you and us arising from or relating to this Agreement." Snyder Decl., Ex. B and D; Blumenthal Decl., Ex. A. The Agreement applies to claims "based upon contract, tort, intentional tort, statutes, regulations, common law and equity." Id. The arbitration clause at issue here is enforceable absent an exception to the strong policy in favor of enforcing arbitration agreements.

1. <u>The Costs of Individual Arbitration</u>

Plaintiffs contend that the arbitration clause, which includes the contractual prohibition on collective action, should not be enforced. In order to effectively arbitrate their anti-trust claims under the existing contractual rubric, plaintiffs argue that each individual plaintiff would have to incur discovery costs amounting to hundreds of thousands of dollars, despite seeking average damages of only $5000. Pls.' Mem. in Opp. to Mot. to Compel Arbitration, 1-7. Plaintiffs seize upon the United States Supreme Court's suggestion in <u>Green Tree Corp. v. Randolph</u> that "[i]t may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating . . . federal statutory rights in the arbitral forum." 531 U.S. 79, 90 (2000). Plaintiffs, however, misconstrue the nature of the judicial inquiry into arbitration costs to which the Supreme Court alludes in <u>Green Tree</u> and <u>Gilmer</u>. A litigant seeking to evade a contractual arbitration clause must "show a likelihood that he or she will be responsible for significant arbitrators' fees, *or other costs which would not be incurred in a judicial forum*. <u>Ball v. SFX Broadcasting, Inc.</u>, 165 F.Supp.2d 230, 240 (N.D.N.Y. 2001) (emphasis added); <u>see also</u> <u>Bradford v. Rockwell Semiconductor</u>, 238 F.3d 549, 556 (4th Cir. 2001) (finding that the "crucial inquiry" is whether "the arbitral forum in a particular case is an adequate and accessible substitute to litigation . . ."). Plaintiffs neither allege nor present evidence that arbitration would be any more costly than litigation.

Specifically, plaintiffs argue that "in the absence of the Collective Action Waivers, the small merchant plaintiff may vindicate its statutory rights by joining its claims with those of other merchants and pooling the costs of litigation (or attracting counsel willing to advance such costs.) In the presence of the Collective Action Waivers, the small merchant flatly cannot vindicate its statutory rights." Pls.' Memo. in Opp. to Mot. to Compel Arbitration at 2. Plaintiffs

present an affidavit from a "professional economist with substantial experience with individual and class action antitrust litigation" who asserts that "it would not be worthwhile for an individual plaintiff . . . to pursue individual arbitration or litigation where the out-of-pocket costs, just for the expert economic study and services, would be at least several hundred thousand dollars, and might exceed $1 million." Decl. of Gary L. French, Ph.D, Pls.' App. of Decls. and Exs. in Opp. to Compel Arbitration, Ex. 5.

Plaintiffs' contention, however, that the costs of individual arbitration would eclipse the value of any potential recovery, ignores the statutory protections provided by the Clayton Act. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."[15] 15 U.S.C.A. 15(a) (2005); see Snowden v. CheckPoint Check Cashing, 290 F.3d 631, 638 (4th Cir. 2002) (rejecting, in a RICO action, plaintiff's argument that a collective action waiver was unenforceable because "without the class action vehicle, [plaintiff] will be unable to maintain her legal representation given the small amount of her individual damages."); see also Plant v. Blazer Fin. Svcs., 598 F.2d 1357, 1365-66 (5th Cir. 1979) (holding, in a Truth in Lending Act action, that "[a]s a practical matter, the award of attorney's fees is a critical and integral part of this

_____

[15]Plaintiffs do not dispute that the full extent of remedies under the Clayton Act would be available in arbitration by any one of the contractually identified arbitrators (the National Arbitration Forum, JAMS/Endispute, and the American Arbitration Association).  See, e.g., In re Universal Service Fund Telephone Billing Practices Litigation, 300 F.Supp. 2d 1107, 1137 (D.Kan. 2003) ("Universal Service Fund I") (enforcing a class action waiver in an arbitration provision in a case which involved anti-trust claims and noting that "[there is no] irreconcilable conflict between a ban on class actions and the substantive rights provided by [the Sherman and Clayton Acts].  Congress already provided ample statutory incentives for plaintiffs to vindicate their rights under those statutes by, for example, being able to recover treble damage and attorneys fees . . .").

section"); accord Johnson v. West Suburban Bank, 225 F.3d 366, 374 (3d Cir. 2000) (holding, in a TILA action, that "while arbitrating claims that might have been pursued as part of class actions potentially reduces the number of plaintiffs . . . arbitration does not eliminate plaintiff incentives to assert rights under the Act").

Although plaintiffs claim that the arbitration and collective action waiver provisions of their contracts combine to "give Amex a 'free pass'" by discouraging litigation, the very statute under which they bring suit provides sufficient financial incentive to pursue their claims in the form of treble damages, costs, and attorneys' fees. Moreover, plaintiffs' attack on the enforceability of the collective action waivers is not an argument against arbitrability, but an argument against enforcing the collective action waiver provisions, whether the claims proceeded in arbitration or court.[16] Accordingly, plaintiffs' opposition to arbitration because of the collective action waiver provisions, on the theory that the costs preclude vindication of individual plaintiff's statutory rights, is unpersuasive.

2. Arbitrability of Plaintiffs' Anti-Trust Claim

In claim IV of plaintiffs' respective amended complaints, they "allege that the imposition of the arbitration clause *with* its Collective Action Waivers thus constitutes an illegal contract in restraint of trade and an unlawful monopoly maintenance device, under §§ 1 and 2 of the Sherman Act." Pls.' Mem. in Opp. to Mot. to Compel Arbitration, 16 (emphasis added). Plaintiffs' contend that this claim is inherently inarbitrable because it "directly challenges the

_____

[16]"The sin of the agreements that Amex has imposed upon the small merchant plaintiffs is not that they mandate arbitration at all; it is that they bar collective action. If the arbitration clauses allowed for a class-wide arbitration, then there would not be a 'cost differential between arbitration and litigation in court . . .[that] is so substantial as to deter the bringing of claims.'" Pls.' Mem. in Opp. to Mot. to Compel Arbitration, 11 (internal citations omitted).

legality of the very clause that would support sending the case to arbitration in the first place."
Id. Again, plaintiffs are actually challenging the enforcement of the collective action waivers, rather than making an argument about inherent inarbitrability. Indeed, arbitration agreements containing class action waivers are not inherently unenforceable as anti-competitive. See, e.g., Snowden v. Checkpoint Check Cashing, 290 F.3d 631, 637-38 (4th Cir. 2002); Randolph v. Green Tree Financial Corp., 244 F.3d 814, 818 (11th Cir. 2001); Johnson v. West Suburban Bank, 225 F.3d 366, 378 (3d Cir. 2000); Livingston v. Associates Finance, Inc., 339 F.3d 553 (7th Cir. 2003); Universal Service Fund I, 300 F. Supp. at 1137 (concluding that the "inability to bring a class action . . . cannot by itself suffice to defeat the strong congressional preference for an arbitral forum").

The enforceability of the collective action waivers is a claim for the arbitrator to resolve. Issues relating to the enforceability of the contract and its specific provisions are for the arbitrator, once arbitrability is established. See Buckeye Check Cashing, Inc. v. Cardegna et al., 126 S. Ct. 1204, 1209 (2006) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance"); see also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 396-97, 404-06 (1967) (holding that an arbitrator should resolve a claim of "fraud in the inducement of the contract generally" since "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate"); Campaniello Imports, Ltd. v. Saporiti Italia S.P.A. et al., 117 F.3d 655, 667 (2d Cir. 1997). Moreover, procedural questions, which grow out of the dispute and bear on its final disposition, are presumptively not for the judge, but for an arbitrator to decide. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964); see also Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002).

In addition, the United States Supreme Court has cautioned against the use of anti-trust defenses to contract actions. See Kelly v. Kosuga, 443 F.2d 783, 785-6 (1959) ("[t]he plea of illegality [of a contract] on violation of the Sherman Act has not met with much favor in this Court"). The Supreme Court made clear that a plaintiff may raise an anti-trust defense to a contract only where enforcement "would make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act." Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 81 (1982). In Viacom Inter'l, Inc. v. Tandem Productions, Inc., the Second Circuit Court of Appeals explained the Supreme Court's concern "that the successful interposition of anti-trust defenses is too likely to enrich parties who reap the benefits of a contract and then seek to avoid the corresponding burdens." 526 F.2d 593, 599 (2d Cir. 1975).

Plaintiffs further claim that if this Court compels arbitration of their anti-trust claim, the Court will be party to defendant's alleged anti-trust violation, i.e. the enforcement of the Honor All Cards provision. However, the collective action waiver does not apply simply to the Honor All Cards provision. According to the merchant contract, plaintiffs may not engage in collective litigation or arbitration with regard to *any* claims arising out of *any terms* of the contract, and not simply when challenging the Honor All Cards provision. In ordering arbitration of plaintiffs' Sherman Act claim in accordance with the language of the contract, this Court is enforcing a binding agreement entered into by the parties, rather than acting as a party to any of the alleged anti-trust actions on the part of defendant. Plaintiffs offer no persuasive argument why an arbitrator cannot adequately consider and resolve all issues of enforceability of the terms of the contract, including plaintiffs' claims regarding the collective action waivers. All of plaintiffs' claims, including their anti-trust claim, are therefore arbitrable.

3. The pre-1999 Plaintiffs, the Change-in-Terms Provision, and the 1999 Amendment

Further contesting defendant's motion to compel arbitration, the pre-1999 plaintiffs contend that 1) the change-in-terms provision in their original merchant contracts with defendant did not allow the later introduction of an arbitration clause, and 2) that, despite discovery on the issue, defendant has failed to establish that the pre-1999 plaintiffs received the mailing imposing the arbitration clause in 1999. The change-in-terms clause in the pre-1999 plaintiffs' merchant contracts provides: "[American Express] has the right to amend this agreement at any time. We will notify you in writing at least ten (10) days in advance. If the changes are unacceptable to you, you may terminate this agreement . . ." Snyder Decl., Ex. A. The parties do not dispute that in 1999 American Express mailed an arbitration agreement amendment to thousands of contracting merchants. The pre-1999 plaintiffs, however, dispute that they received this mailing.

Plaintiffs draw this court's attention to Stone v. Golden Wexler & Sarnese, P.C., a recent case that invalidated an arbitration agreement added to a contract via mailing. 341 F. Supp. 2d 189 (E.D.N.Y. 2004). The Stone court found the supplementary arbitration agreement invalid on the ground that the change-in-terms provision[17] in the original contract was drafted in such a way that the consumer plaintiffs could not "have anticipated that the Bank would change the method and forum for resolving disputes." Id. at 197. Since the contract as a whole lacked any mention of terms relating to dispute resolution, the court found that an arbitration agreement

---

[17]The Change in Terms provision at issue in the Stone case between consumers and the Bank read in pertinent part: "We may amend or change any part of your Agreement, including the periodic rates and other chargers, or add or remove requirements at any time...Changes to the annual percentage rate(s) will apply to your account balance from the effective date of the change...Changes to fees and other charges will apply to your account balance." Stone, at 197. The surrounding sections of the Customer Agreement in Stone dealt with such topics as credit limits, membership fees, periodic statements, and finance charges. Id. At 197-98.

was not reasonably within the "universe of terms which could be altered or affected pursuant to the clause." Id. at 198. In a similar case, an Eastern District of Pennsylvania court held a supplementary arbitration agreement void when the terms of the original contract failed to "alert a consumer to the fact that [defendant] might later impose a term abrogating their rights." Perry v. FleetBoston Fin. Corp., No. 04-507, 2004 U.S. Dist. LEXIS 12616, at *13 (E.D.P.A. July 6, 2004) (noting elsewhere that "no mention of dispute resolution - either in an arbitral or judicial forum - existed in their original Cardholder Agreements").

The change-in-terms clause in the instant case, however, when coupled with other terms in the pre-1999 plaintiffs' merchant contracts, rendered the arbitration amendment at issue a reasonable addition to the original contracts.[18] The original contracts[19] included several terms relating to disputes and their resolution, including: a section entitled "Full Recourse" which "means that we [American Express] are entitled to payment from you [the merchant] for amounts payable or paid to you" in the event of any disputed charges or non-compliance with the terms of the contract; a section entitled "Disputed Charges," explaining that the merchant must respond in writing to any "claim, complaint, or question about any charge" if American Express requests

---

[18]In contrast to the Stone change in terms provision, American Express' pre-1999 merchant contracts stated in pertinent part: "We have the right to change this Agreement at any time. We will notify you of any change in writing at least ten (10) days in advance. If the changes are unacceptable to you, you may terminate this Agreement." See Snyder Decl., Ex. A, C, and E. The surrounding sections in addition to discussing the parameters of the parties' financial relationship also discuss topics such as bankruptcy, indemnification, compliance with laws, governing law, waiver, assignment, and terminating the agreement.

[19]American Express was only able to provide copies of the merchant contracts in existence on the date of their agreement for three of the six pre-1999 plaintiffs. The merchant contract in effect in 1993 when Italian Colors signed an agreement with American Express is Exhibit A of the Snyder Declaration; the 1989 contract applicable to Bunda Starr is Exhibit C of the Snyder Declaration; and the 1991 contract applicable to Mascari is Exhibit E of the Snyder Declaration. Copies of the contracts in effect for Chez Noelle in 1982, Il Forno in 1988, and 492 Supermarket Corp. in 1996 were not located. See Snyder Decl. at 4-5 ¶¶ 7, 9 and 12.

16

and that American Express will have the right to "Full Recourse" from the merchant if a cardmember continues to withhold payment after the merchant's reply and the "[c]ardmember has the right under applicable law" to do so; a section entitled "Indemnification," whereby the merchant agrees to indemnify American Express and others "from and against all damages, losses and expenses...including reasonable attorneys' fees and costs" in "any suit or claim" arising out of certain situations under the agreement; a provision terminating the Agreement if the merchant becomes insolvent or involved in bankruptcy proceedings; and a "Governing Law" section identifying New York law as governing the agreement. See, e.g., Snyder Decl., Ex. A, C, and E.[20]

Since the pre-1999 merchant contracts contained provisions concerning the resolution of disputes, including sections pertaining to various legal proceedings such as bankruptcy and lawsuits in which the merchant would indemnify American Express and pay their attorneys' fees, the original contract sufficiently alerted plaintiffs that the defendants' might later amend the terms of the contract with respect to the resolution of disputes between the parties. Cf. Perry, 2004 U.S. Dist. LEXIS 12616 at *13 (holding that an "ambiguous" change in terms provision did not allow Fleet "to make previously uncontemplated, unilateral changes to the Cardholder Agreement" like the arbitration provision since "no mention of dispute resolution - either in an arbitral or judicial forum - existed in their original Cardholder Agreements" ). The 1999 arbitration amendment was reasonably within the "universe of terms which could be altered or affected pursuant to the clause." Cf. Stone, 341 F. Supp. 2d at 198. Moreover, unlike Stone, and virtually all of the cases upon which it relies, the agreement at issue in the instant case is an

---

[20]The quoted sections can be found in the 1993 merchant agreement. Snyder Decl., Ex. A. Sufficiently similar provisions under various headings can be found in Exhibits C and E.

agreement between commercial parties, rather than one involving consumers. If American Express' 1999 arbitration amendment was not acceptable to any of the plaintiff merchants, each merchant was free to terminate its relationship with American Express rather than be subject to the amendment. Instead, the plaintiffs elected to continue their relationship with American Express well after the arbitration amendment was put into place.

The pre-1999 plaintiffs also deny having received the 1999 arbitration amendment. In light of documents produced by both parties during discovery on the limited issue of receipt of the amendment, however, plaintiffs have not successfully rebutted the presumption of mailing to which defendants are entitled. Under New York law, "when . . . there is proof of the office procedure followed in a regular course of business, and these procedures establish that the required notice has been properly addressed and mailed, a presumption arises that notice was received." Leon v. Murphy, 988 F.2d 303, 309 (2d Cir. 1993) (citing Nassau Insurance Co. v. Murphy, 46 N.Y.2d 828, 829-30 (1978)). Once defendants have adduced sufficient evidence to merit that presumption, "[t]he mere denial of receipt does not rebut [it]." Leon, 988 F.2d at 309.

Defendants have presented evidence that establishes the following: in 1999 American Express compiled a list of merchants from whom it had processed charges in the previous twelve months; each of the plaintiffs submitted charges during that time period; each of the plaintiffs conceded having received other mailings from American Express during the relevant time period; a professional mailing company determined that 99.7% of the roughly 1.5 million merchant addresses given it by American Express could be reached by mail; and an American Express executive affirmed via affidavit that normal business practices were employed in the course of the mailing. Plaintiffs do not dispute, or produce evidence to challenge, these assertions. Although plaintiffs deny having received the amendments, this self-serving assertion

is insufficient to rebut the presumption of mailing. Plaintiffs' presentation of a handful of e-mails reflecting frustration on the part of several of defendant's employees who conducted the mailing is similarly inconclusive. See Meckel v. Continental Resources, 758 F.2d 811 (2d Cir. 1985) ("There must be - in addition to denial of receipt - some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable"). The arbitration amendment is therefore not rendered unenforceable for lack of receipt by the pre-1999 plaintiffs.

B. California's Unfair Competition Law

In the fifth claim of their amended complaint, the California plaintiffs claim that the collective action waivers violate California's Unfair Competition Law. Whether or not the defendants violated the California Unfair Competition Law by allegedly forcing small merchants to waive the right to participate in both class actions and class-wide arbitrations as a condition of doing business with American Express, is not a bar to sending all of the plaintiffs to arbitration pursuant to their contractual agreement with American Express. Rather, both the Sherman Act anti-trust claim and the California Unfair Competition claim are substantive matters to be raised before the arbitrator. See, e.g., Zurich Ins. Co. v. Ennia General Ins. Co., 882 F.Supp. 1438, 1440 (S.D.N.Y. 1995) (holding that the issue of the law to be applied is a question for the arbitration panel, not the court once it determined that a binding agreement to arbitrate existed and the underlying dispute between the parties fell within its scope); see also ATSA of Calif., Inc. v. Continental Ins. Co., 702 F.2d 172, 175 (9th Cir. 1983), amended, 754 F.2d 1394 (9th Cir. 1985) ("when parties agree to submit disputes to arbitration it is presumed that the arbitrator is authorized to determine all issues of law and fact necessary to resolve the dispute"). Indeed, in determining arbitrability, the court may not consider the merits of the parties' claims or the

likelihood of success at arbitration, since the parties agreed to submit "any claim" to arbitration, not just those claims which the court determines are meritorious.  See Spear, Leeds & Kellogg, 85 F.3d at 28-29.  The California plaintiffs' concede as much in their motion papers.[21]  Therefore their motion for partial summary judgment is denied without prejudice and the issue may be raised in the arbitral forum.

CONCLUSION

American Express's motion to compel arbitration of all claims against it is granted.  Since this Court finds that all of plaintiffs' claims against American Express are subject to arbitration, it further orders that plaintiffs' cases against American Express be dismissed.  See Lewis Tree Serv., Inc. v. Lucent Technologies, Inc., 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002) (where "no useful purpose will be served by granting a stay" the action should be dismissed); see also Wilson v. Wells Fargo Financial Acceptance, Inc., No. 3:02-0383, 2003 WL 1877336 (M.D. Tenn. Apr. 9, 2003) (dismissing case in favor of arbitration, and holding that "if all of the issues in dispute are governed by the arbitration agreement, then it would generally be an inefficient use of the court's docket to enter a stay, when the arbitration will likely be dispositive of all the issues").

American Express's motion to intervene and to dismiss the claims of plaintiffs against the banks in National Supermarket is denied.  The bank defendants' motion to dismiss the claims in

---

[21] "Finally this motion is not about arbitration.  No one disputes the strong public policies supporting arbitration or the broad scope of the FAA.  This motion, rather, is about Collective Action Waivers, which violate California law because they cut off plaintiffs' rights to participate in *both* class actions *and* class-wide arbitration.  In this case, there would be no violation of applicable law if the defendants' agreements allowed small merchants either to participate in class actions or to take part in class-wide arbitrations.  The arbitral organizations identified in the defendants' agreements with small merchants all have rules authorizing and governing class-wide arbitration."  Pls.' Mem. in Sup. of Mot. for Partial Summary Judgment, 3 (emphasis in original).

National Supermarket is denied. The bank defendants' motion to stay the action in National Supermarket pending the arbitration of related claims against American Express, is granted.

The Cohen Rese plaintiffs' motion for partial summary judgment on their fifth claim against American Express is denied without prejudice.

Dated: March 15, 2006
New York, New York

SO ORDERED:

_George B. Daniel_

GEORGE B. DANIELS
United States District Judge