Gary B. Friedman (GF 2597)
Tracey Kitzman (TK 5869)
Dean M. Solomon (DS 3699)
**FRIEDMAN LAW GROUP LLP**
270 Lafayette Street, 14th Floor
New York, New York 10012
(212) 680-5150

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
Lisa Hayes, Esq.
**REINHARDT WENDORF & BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Christopher W. Hellmich, Esq.
Read K. McCaffrey, Esq.
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

*Co-Lead Counsel For Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

| | |
|---|---|
| In re AMERICAN EXPRESS MERCHANTS' LITIGATION, | Master File No. 03 CV 9592 (GBD) |
| This Document Relates To Civil Action Nos.: 04 CV 0266 (Chez Noelle Restaurant) 04 CV 1558 (Mim's Enterprises) | **FIRST AMENDED COMPLAINT** |

------------------------------------------------------------------x

Plaintiffs Chez Noelle Restaurant, Inc. and Mim's Enterprises, Inc. d/b/a Mim's

Restaurant, on behalf of themselves and all others similarly situated, as and for their First

Amended Complaint against Defendants American Express Company and American

Express Travel Related Services Company, Inc. (collectively, "American Express" or

"Amex"), hereby allege as follows:

## I.

## INTRODUCTION

1.     Amex is the leading issuer of general-purpose payment cards to businesses

and affluent consumers in the United States and throughout the world.  It is also the

leading provider of payment card transaction acquiring services to merchants.

2.      Amex leverages its market power by requiring that merchants, as a condition of being permitted to accept Amex's personal charge cards, corporate cards and/or small business cards (the "Tying Products"), must also agree to accept the standard consumer credit card products that Amex launched during the Statutory Period (as defined below), including (i) the Blue From American Express® consumer credit cards ("Blue Cards"), (ii) the co-branded Amex-Costco consumer credit card (the "Costco Cards") and (iii) the standard, no-annual fee, consumer revolving credit cards issued by U.S. banks to run on the Amex network under the management of Amex's General Network Services (the "Standard GNS Cards") at grossly supracompetitive prices (the "Tying Arrangements").  The Blue Cards, Costco Cards and Standard GNS Cards comprise the "Tied Products" that are the subject of this Action.

3.      This action challenges the Tying Arrangements as unlawful restraints of trade under the federal antitrust laws.  Brought on behalf of all merchants that accept Amex products or that have accepted Amex products during the Statutory Period (as defined below), this class action seeks an injunction as well as monetary damages.

## II.
## <u>JURISDICTION AND VENUE</u>

4.      Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent and restrain violations of section 1 of the Sherman Act, 15 U.S.C. § 1.  In addition, the Plaintiffs seek damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22 and 26, because Amex "may be found or transacts business" within this District.  Among other things, Amex and its subsidiary TRS have marketed their charge

card services, along with the unlawfully tied credit card services, to thousands of merchants within this District. The interstate commerce that is affected by the antitrust violations alleged in this action is carried on, in part, within this District.

### III.
### THE PARTIES

6.      Plaintiff Chez Noelle Restaurant, Inc. is a New York corporation with its principal place of business in Port Washington, New York.

7.      Plaintiff Mim's Enterprises, Inc. doing business as Mim's Restaurant is a New York corporation with its principal place of business in Huntington, New York.

8.      Both Chez Noelle and Mim's Restaurant have accepted American Express-branded payment cards throughout the Statutory Period (as defined below) and both continue presently to accept such payment cards.

9.      Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

10.     Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York. TRS is a wholly owned subsidiary of Amex.

### IV.
### CLASS ACTION ALLEGATIONS

11.     Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(2) to restrain an unlawful practice under section 1 of the Sherman Act, and as a damages class action under Rule 23(b)(3).

12.     The proposed damages class under Rule 23(b)(3) is comprised of all merchants that have accepted Amex personal charge cards, corporate cards and small

business cards, and have thus been forced to agree to accept the Tied Products, during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States.  A distinct but overlapping proposed injunctive class under Rule 23(b)(2) is comprised of all merchants in the United States that currently accept Amex payment cards.  Together, the injunctive class and damages class are referred to as the "Class." The Class does not include Amex, its subsidiaries, directors, officers, or members of their families.

13.    The Tying Arrangements affect each merchant that accepts Amex cards. The members of the Class are so numerous that joinder of all members is impracticable.

14.    There exist no conflicts of interest as between Plaintiffs and the other Class members.  Plaintiffs have retained counsel that is competent and experienced in federal antitrust litigation.   Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.

15.    In relevant respect, Amex has acted and continues to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the injunctive class as a whole is appropriate.

16.    This class action is superior to any other method for the fair and efficient adjudication of this dispute.  The damages suffered by many members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for individual Class members to attempt to vindicate their interests individually.  There will be no extraordinary difficulty in the management of this Class action.

17.     Throughout the Statutory Period, Amex uniformly imposed the Tying Arrangements upon all Class members.  All Class members have been damaged in precisely the same fashion, by precisely the same conduct.  The degree of damages suffered by individual Class members is readily calculable according to an ascertainable formula.  For all of these reasons, questions of law and fact will predominantly be common to the Class.  Among the questions of law and fact common to the Class are:

(i)     Whether Amex demands from merchants, as a condition of being permitted to accept the Tying Products, that the merchant must also accept the Tied Products;

(ii)    Whether Amex's Tying Arrangements are *per se* unlawful, because: (a) Amex possesses and exercises monopoly or market power in the markets in which its Tying Products compete; or (b) Amex possesses economic power sufficient to make probable the coercive Tying Arrangements; and

(iii)   Whether the merchant discount rates that members of the Class have been forced to pay for transactions on the Tied Products exceed the rates that would prevail in the absence of the Tying Arrangements, or in otherwise competitive markets for credit card acquiring services.

## V.

## FACTUAL BACKGROUND

18.     Founded in 1850, Amex is primarily engaged in the payment card business throughout the world.

## The Tying Products

19.     Through its wholly owned subsidiary, TRS, Amex issues to consumers general-purpose personal charge cards that include the Amex Green Card, Amex Gold

5

Card, and Amex Platinum Card, among others ("Personal Charge Cards"). Personal Charge Cards, according to descriptive materials disseminated by Amex, "are primarily designed as a method of payment and not as a means of financing purchases of goods or services." Personal Charge Cards require payment by the cardholder of the full amount billed each month, and no finance charges are assessed (although accounts that are past due are subject, in most cases, to a delinquency assessment). Amex's Personal Charge Cards also carry no pre-set spending limits, provide access to Amex's proprietary Membership Rewards® program and require cardholders to pay an annual fee.

20. In addition to issuing Amex-branded Personal Charge Cards to consumers, TRS acts as a "merchant acquirer," meaning that it "acquires" transactions or receivables from merchants for the Amex network, and it manages all aspects of the relationship with that merchant. TRS signs up new merchants through a variety of sales channels, including a proprietary sales force, third party sales agents, the Internet, telemarketing and by receiving in-bound inquiries from merchants who seek to do business with Amex. More than three million merchants participate in the Amex network in the United States.

21. Once a merchant enters into an agreement with TRS to accept Amex products as a method of payment for goods and services that merchant becomes known as a "service establishment" in the vernacular of Amex. When a cardholder (known as a "Cardmember") presents the charge card for payment, the service establishment creates a record of charge for the transaction and submits it to TRS for payment.

22. Before making payment to the service establishment, TRS deducts its fee, known as the "merchant discount fee." This discount fee is calculated by taking the amount of the charge submitted by the service establishment and multiplying it by the

applicable "discount rate." As of 2001, the blended "all-in" discount rate for all Amex cards across all merchant categories was approximately 2.7%, while the corresponding average "all-in" discount rate for each of Visa and MasterCard was 2.0%.

23.     While the discount rate charged by TRS does vary somewhat with the type of participating establishment and the charge volume, for each of the merchant categories tracked by Amex, the discount rate is higher than the discount rate that merchants pay in connection with standard consumer credit cards issued on competing networks, such as Visa, MasterCard and Discover.

24.     In addition to the general-purpose Personal Charge Cards that TRS issues to individual consumers, Amex, through its Global Corporate Services Group ("GCSG"), issues corporate charge cards to corporations and other business entities ("Corporate Cards").

25.     According to the definition employed by GCSG, a Corporate Card is a charge card issued to individuals through a corporate account established by their employer for business purposes. GCSG issues Corporate Cards to at least 70% of the companies included in the Fortune 500, and is likewise the leading issuer of Corporate Cards to middle-market companies (which GCSG defines as U.S. firms with annual revenues of $10 million to $1 billion and annual travel and entertainment expenditures between $100,000 and $10 million) and small businesses.

26.     Amex issues payment cards to small businesses through its OPEN Small Business Unit ("Small Business Cards"). Small Business Cards are charge cards or revolving credit cards issued to businesses that generally have revenues under $10 million per year.

27.     Amex possesses a commanding market share in the U.S. markets for Personal Charge Card services, Corporate Card services and Small Business Card services.    Indeed, as Amex notes in its marketing presentations to merchants, many companies require their employees to use the Amex Corporate Card for business related purchases.  Amex's network competitors in the domestic markets for Corporate Card and Small Business Card services include Diner's Club, Visa and MasterCard.

**The Tied Products**

28.     The launch of Blue in 1999 was specifically designed to extend Amex's reach into the standard consumer *credit* card market.  As a senior Amex executive has stated: "Blue has accomplished our primary purpose, which was to establish American Express as more than a charge card company . . . Blue has been a breakthrough, setting us up as a credit card issuer."  That same year, Amex launched the Costco Card.  Both the Blue Card and the Costco Card are standard, revolving consumer credit card products that are offered on a no-annual fee basis and are largely interchangeable with standard card offerings on competitor networks.

29.     Beginning in or around the mid-1990s, Amex also initiated a strategy whereby it would invite banks and other qualified financial institutions in the United States to license the Amex logo and begin issuing credit cards on the Amex network (the "Bank Strategy").  The lynchpin of the Bank Strategy – and the value proposition that underlay Amex's approach to banks – was the unlawful Tying Arrangement.  Because of the unlawful tie-in to Amex charge cards, issuing banks would be assured that merchants would accept the Amex-branded credit card offerings, notwithstanding that those offerings were priced above competitive rates by – oftentimes – a factor of roughly 35%.

30.     The Bank Strategy did not work, however, for one reason: the rules and policies of Visa and MasterCard in the United States called for expulsion of members who issue payment cards branded with the marks of Amex, Discover Card or any entity other than Visa or MasterCard.  In response to its inquiries, Amex found no banks that were willing to forfeit membership in Visa or MasterCard, and the Bank Strategy appeared dead in its tracks.

31.     In 1998, however, the U.S. Department of Justice, responding in part to concerns voiced by Amex, initiated an action in the United States District Court for the Southern District of New York against Visa and MasterCard, alleging that the associations' rules violate federal antitrust laws to the extent that they preclude member banks from issuing payment cards that carry the logos of Amex or other brands other than Visa or MasterCard (the "DOJ Case").  In October 2001, the district court ruled in favor of the Justice Department and was subsequently upheld on appeal by the U.S. Court of Appeals for the Second Circuit.  As a result, the banks that comprise the Visa and MasterCard networks are contractually free to issue payment cards bearing the Amex logo.

32.     Following the DOJ Case, Amex implemented its strategy of inviting commercial banks to issue Amex-branded standard credit cards, secure in the knowledge that: (a) all Amex service establishments will be forced to accept those credit cards lest they forfeit the ability to accept the Tying Products; and (b) the merchants will be forced to pay discount fees (including an interchange fee to the issuing bank) that are far higher than the rates charged by Visa and MasterCard.   Since 2004, Amex has successfully induced MBNA America, its successor Bank of America, Citibank, HSBC and USAA

Federal Savings Bank, among others, to issue credit cards under the Amex network, under the management of Amex's General Network Services ("GNS") unit. Amex was able to attract these bank issuers because it was able to offer them a share of supracompetitive discount fees, which it is able to extract from merchants on the Standard GNS Card products only because of the Tying Arrangements.

**The Unlawful Tying Arrangement**

33.     The standard form "Agreement For American Express Card Acceptance" which TRS uses with merchants in the retail industry (the "Merchant Agreement") provides that the merchant must accept "any card issued by [American Express] bearing [its] name, trademark, service mark or logo." Pursuant to the terms of the Merchant Agreement, a retailer may not accept the Tying Products unless it also agrees to accept the Tied Products.

34.     Amex charges merchants the same discount rates on all Amex-branded Personal Charge, Corporate, Small Business and personal credit cards.

35.     Merchants are also precluded under the Merchant Agreements from seeking to "steer" or induce customers at the point of sale to use less expensive payment media, such as other credit cards, cash, or debit cards. Amex defines such merchant conduct as "suppression" of Amex cards, and it employs a policy of "canceling merchants who suppress usage of the American Express Card."

36.     The net result of Amex's policies is that merchants are forced to accept the Tied Products at supracompetitive prices. But for the Tying Arrangement, the vast majority of merchants that accept Amex would not accept the Tied Products at the supracompetitive discount rate charged by TRS. Most merchants would not willingly

pay discount fees that are at least 35% higher than competitive rates.  They do not believe that accepting the Tied Products attracts incremental customers or generates more purchases, relative to alternative means of payment.

37.    However, even for those merchants who *do* believe that accepting the Tied Products attracts incremental customers or generates larger purchases – i.e., even for those merchants who would accept the Tied Products absent the coercive Tying Arrangements – the Tying Arrangements nevertheless cause economic injury because, in the absence of the ties, the discount rate for the Tied Products could not exceed competitive levels.  Given the opportunity, enough merchants would decline the Tied Products that the merchant discount fees associated with those credit cards would come down to a competitive level.

## VI.
### RELEVANT MARKETS

38.    Personal Charge Card services form the product dimension of a relevant market, the geographic dimension of which is the United States (the "Personal Charge Card Services Market").

39.    In fact, there exists a relevant product market that consists solely of Amex-brand Personal Charge Card services (the "Amex-brand Personal Charge Card Services Market").

40.    Amex possesses substantial market power or monopoly power in the Personal Charge Card Services Market and the Amex-brand Personal Charge Card Services Market.

41.    Corporate Card services form the product dimension of another relevant market, the geographic dimension of which is the United States (the "Corporate Card

11

Services Market").

42     In fact, there exists a relevant product market that consists solely of Amex-brand Corporate Card services (the "Amex-brand Corporate Card Services Market").

43.     Amex possesses substantial market power or monopoly power in the Corporate Card Services Market and Amex-brand Corporate Card Services Market.

44.     Small Business Card services form the product dimension of another relevant market, the geographic dimension of which is the United States (the "Small Business Card Services Market").

45.     In fact, there exists a relevant product market that consists solely of Amex-brand Small Business Card Services (the "Amex-brand Small Business Card Services Market").

46.     Amex possesses substantial market power or monopoly power in the Small Business Card Services Market and Amex-brand Small Business Card Services Market.

47.     The acceptance of standard personal credit cards is not a substitute for the acceptance of Personal Charge, Corporate or Small Business Cards from the point of view of merchants.

48.     In addition, application of the guidelines established by the United States Department of Justice and the Federal Trade Commission compel the conclusion that Amex commands market power in the relevant product markets set forth above.

## VII.

## HARM TO COMPETITION AND TO CONSUMERS

49.     As a result of the Tying Arrangements, Amex is able to extract from merchants discount fees in the tied market for standard credit card services that are far higher than its competitors' fees for standard credit card services.  At the same time, the fees that Amex charges merchants for services in the Tying Product markets exceed the fees charged by Amex's competitors.

50.     Accordingly, merchants pay significantly more for the tied bundle of services than they would pay in the absence of the coercive tie-in.  As merchants pass these costs along, prices rise and consumers are injured.

51.     Another effect of the Tying Arrangement is to effectively preclude a competitive low cost provider such as Discover Card, or any future credit card market entrant, from accessing the critical issuing and marketing resources of third party issuers, specifically commercial banks.  By dint of the Tying Arrangements, the banks have the ability to share in supracompetitive profits by issuing Amex-branded credit cards.  Their finite issuing and marketing resources, therefore, will not be available to Discover or any future entrant attempting to provide a lower cost service.

52.     In addition, Amex's ability to charge merchants supracompetitive fees and share them with issuing banks necessarily results in (a) the foreclosure of a significant portion of the credit card issuing market, as issuing banks that had previously committed resources to Visa and MasterCard will dedicate their issuing and marketing resources to Amex-branded cards, and/or (b) a significant increase in Visa and MasterCard's interchange rates, as they incur elevated costs in a bid to keep banks from defecting to the American Express network.

## CLAIM FOR RELIEF

For Violation Of Sherman Act § 1 Through Unlawful Tying Of
(A) Corporate, Small Business and/or Personal Charge Card Services And (B) Blue,
Costco and Standard GNS Credit Card Services

53.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

54.     Amex launched its Blue Cards, Costco Cards and Standard GNS Cards subject to the Tying Arrangement under which merchants were required to accept these cards at the offered rate, as a condition of being permitted to accept (or to continue to accept) Amex Corporate Cards, Small Business Cards and Personal Charge Cards.

55.     The Tying Arrangement affects a substantial amount of interstate commerce. Roughly four million service establishments in every U.S. state are forced to accept the Tied Products at supracompetitive rates.

56.     The Tying Products, Amex Corporate Cards, Small Business Cards and Personal Charge Cards (or the transaction acquiring services related to each of these cards) are distinct from the Tied Products, Blue, Costco and Standard GNS Cards and related services.

57.     Amex and TRS have actually tied the provision of the various card services at issue on this Claim for Relief, as the tying arrangement has been implemented in millions of merchant agreements.

58.     Amex has appreciable market power in the Tying Product markets.

59.     The maintenance of the Tying Arrangement has the effect of foreclosing competition; raising prices to merchants, and hence their customers, for transactions on the Amex network; driving up card acceptance costs for merchants and their customers on networks other than Amex; and is otherwise anticompetitive.

14

60.     If Amex had not been able to launch the Tied Products subject to the condition that the merchant must accept that card at the offered rate or forfeit the ability to accept the Tying Products, then Amex could not have obtained from merchants supracompetitive discount rates for the Tied Products.

61.     The Tying Arrangement is per se unlawful.  Alternatively, to the extent it is measured under a "rule of reason" analysis, the adverse effect of the Tying Arrangement upon competition as a whole in the relevant market for card acceptance services is not outweighed by any pro-competitive virtue in that market, and any pro-competitive virtue could be achieved through alternative means that are less restrictive of competition.

62.     In the absence of appropriate injunctive relief, Amex's violations of the antitrust laws will continue unabated and the Class will continue to suffer the harms complained of in this action.

63.     As a direct, foreseeable and proximate result of Amex's violation of the Sherman Act, section 1, plaintiff and the Class have been injured in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully demands:

A.     That the Court declare, adjudge and decree that Defendants have committed the violations of federal law alleged herein;

B.     That the Court enter an Order pursuant to Fed. R. Civ. P. 23 permitting this action to be maintained as a class action on behalf of the Class specified herein;

C.     That defendants be permanently enjoined and restrained from implementing or enforcing the Tying Arrangements, or from entering into agreements

15

with merchants whereby the ability of the merchant to accept Amex Corporate Cards, Small Business Cards and/or Personal Charge Cards is conditioned upon its agreement to accept Amex Blue, Costco, or Standard GNS credit card products;

      D.     That the Court award damages, based upon overcharge incurred by the Damages Class on the Blue and Costco credit card products, in amounts to be determined at trial and then trebled;

      E.     That the Court award attorneys' fees and costs of suit; and

      F.     That the Court award such other and further relief as it may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues so triable.

Dated: New York, New York
February 19, 2009

**FRIEDMAN LAW GROUP LLP**

Gary B. Friedman (GF 2597)
Tracey Kitzman (TK 5869)
Dean M. Solomon (DS 3699)
270 Lafayette Street, 14th Floor
New York, New York 10012
Tel:    (212) 680-5150
Fax:    (646) 277-1151

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
Lisa Hayes, Esq.
**REINHARDT WENDORF & BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Christopher W. Hellmich, Esq.
Read K. McCaffrey, Esq.
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

*Co-Lead Counsel For The Plaintiffs*

*Additional Counsel On Following Page*

Brian Murray, Esq.
Scott Levy, Esq.
**MURRAY, FRANK & SAILER LLP**
275 Madison Avenue, 8th Floor
New York, New York 10016
(212) 682-1818

Blaine H. Bortnick, Esq.
**LIDDLE & ROBINSON, L.L.P.**
800 Third Avenue
New York, New York 10022
(212) 687-8500

Bernard Persky, Esq.
Kellie Lerner, Esq.
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
(212) 907-0700

Robert W. Cohen, Esq.
**LAW OFFICES OF ROBERT W. COHEN**
1875 Century Park, Suite 600
Los Angeles, California 90067
(310) 282-7586

Michael Goldberg, Esq.,
**GLANCY BINKOW & GOLDBERG LLP**
1801 Ave. of the Stars, Suite 311
Los Angeles, California 90067
(310) 201-9150

Robert C. Schubert, Esq.
Willem F. Jonckheer, Esq.
**SCHUBERT JONCKHEER KOLBE & KRALOWEC LLP**
3 Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Richard Rouco, Esq.
**WHATLEY DRAKE & KALLAS LLP**
2001 Park Place North, Suite 1000
Birmingham, AL 35203
(205) 328-9576

David Markun, Esq.
Kevin Eng, Esq.
**MARKUN ZUSMAN & COMPTON LLP**
465 California Street, Suite 500
San Francisco, California 94104
(415) 438- 4515

Noah Shube, Esq.
**LAW OFFICES OF NOAH SHUBE**
434 Broadway, Sixth Floor
New York, New York 10013
(212) 274-8638

Karl Cambronne, Esq.
Jeffrey D. Bores, Esq.
**CHESTNUT & CAMBRONNE P.A.**
222 South Ninth Street
Minneapolis, Minnesota 55402
(612) 339-7300

Kamran Mashayekh, Esq.
**CHARGOIS, MASHAYEKH & HERRON, LLP**
2201 Timerlock Place, Suite 110
The Woodlands, Texas 77380
(281) 444-0604

Curtis V. Trinko, Esq.
**LAW OFFICES OF CURTIS TRINKO**
16 West 46th Street, 7th Floor
New York, New York 10036
(212) 490-9550

Daniel R. Karon, Esq.
Mark S. Goldman, Esq.
**GOLDMAN SCARLATO & KARON, P.C.**
55 Public Square, Suite 1500
Cleveland, OH 44113
(216) 622-1851

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiffs' First Amended Complaint has been furnished in the manner stated below to the following individuals on this 19th day of February, 2009:

**BY EMAIL AND HAND DELIVERY**

Jonathan M. Jacobson, Esq.
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
(212) 999-5800

Evan R. Chesler, Esq.
CRAVATH SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1243

_____
Dean M. Solomon